James Saul (OSB #152809)
Lia Comerford (OSB #141513)
Earthrise Law Center at
Lewis & Clark Law School
10015 SW Terwilliger Blvd
Portland, OR 97219
Tel. (503) 768-6929
Fax (503) 768-6642
jsaul@lclark.edu
comerford@lclark.edu

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, | Case No. _____ |
| Plaintiff, | COMPLAINT |
| v. | Federal Clean Water Act (28 U.S.C. § 1331 and 33 U.S.C. § 1365(a)) |
| CITY OF MEDFORD, | |
| Defendant. | DEMAND FOR JURY TRIAL |

## **INTRODUCTION**

1.     This is a complaint for injunctive and declaratory relief and civil penalties

under the Federal Water Pollution Control Act, commonly known as the Clean Water

Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA" or "Act"). Plaintiff Northwest Environmental

COMPLAINT – 1

Advocates ("NWEA") brings this suit under Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), against the City of Medford ("Medford") for its past and continuing violations of the Act that have contributed to degradation of the Rogue River in Jackson County, Oregon.

2.  Medford has violated, and continues to violate, the terms of its wastewater discharge permit by discharging polluted effluent from its Regional Water Reclamation Facility ("Facility") that contributes to myriad detrimental changes to the downstream waters of the Rogue River, a prized fishery and one of the crown jewels of the Wild & Scenic Rivers System.

3.  Medford has regularly discharged excess nutrients (such as nitrogen and phosphorus), materials of high biological and/or chemical oxygen demand, and other pollutants which in combination contribute to conditions of nutrient enrichment and depressed dissolved oxygen in the Rogue River and contribute to the loss of ecological integrity downstream of Medford's discharge. The resulting detrimental changes to the Rogue River include excessive growth of nuisance algae, unnatural shifts in the macroinvertebrate community, and a visibly discolored foamy plume, among others.

4.  Medford's discharges contribute to violations of two narrative water quality standards applicable to the Rogue River. The first is Oregon's "biocriterion," which requires that all waters of the State "be of sufficient quality to support aquatic species without detrimental changes in the resident biological communities." OAR

340-041-0011. The second is Oregon's state-wide narrative criteria, which prohibit, *inter alia*, the "development of fungi or other growths having a deleterious effect on stream bottoms, fish or other aquatic life" as well as "[o]bjectionable discoloration, scum, oily sheens, or floating solids[.]" OAR 340-041-0007(9), (12).

5.      Moreover, Medford has failed to comply with the "duty to mitigate" provision contained in its wastewater discharge permit, which requires it to "take all reasonable steps to minimize or prevent any discharge . . . in violation of this permit that has a reasonable likelihood of adversely affecting human health or the environment." Medford has been aware of its permit violations since at least 2013, and yet has refused to abate those violations or to take even minimal steps to modernize its antiquated pollution control equipment. Notably, Medford's Facility lacks widely available treatment systems to reduce levels of nutrient pollution in its effluent, even though it has the financial ability to install such equipment.

6.      The Medford Facility's violations of the CWA are ongoing, and continue to occur on each day that the Facility discharges effluent to the Rogue River. Further, these violations have caused and, without an order of this Court, will continue to cause harm to NWEA and its members and others who use and enjoy the Rogue River in areas near and downstream of where Medford's violations take place.

7.      NWEA seeks injunctive and declaratory relief under Section 505(a) and (d) of the CWA, 33 U.S.C. §§ 1365(a) and (d), including an order requiring Medford to

COMPLAINT – 3

take all steps necessary to promptly and permanently end its CWA violations.

Additionally, NWEA seeks the imposition of civil penalties for each of the violations

described above pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), as

adjusted by 40 C.F.R. § 19.4. NWEA also seeks an award of costs and attorney fees

pursuant to 33 U.S.C. § 1365(d), and any other remedy this Court deems just and

proper.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331

(federal question jurisdiction) and 33 U.S.C. § 1365(a) (Clean Water Act jurisdiction).

The requested relief is authorized by 33 U.S.C. §§ 1319(d) and 1365(a).

9.     Venue is properly vested in this Court pursuant to 33 U.S.C. §

1365(c)(1), because the events giving rise to the claims alleged herein occurred in

Medford, Oregon, which is located within this judicial district.

10.     As required by the CWA, 33 U.S.C. § 1365(b), by letter dated October 26,

2017, NWEA provided Medford with notice of its intent to file suit to abate the

violations alleged herein. As required by 40 C.F.R. § 135.2(a)(1), NWEA sent copies of

its notice letter to the Administrator of the U.S. Environmental Protection Agency

("EPA"), the Regional Administrator for EPA Region 10, and the Director of the

Oregon Department of Environmental Quality ("DEQ").

COMPLAINT – 4

11.    More than sixty days have passed since NWEA's notice of intent to sue was given the proper parties, and Medford continues to violate its NPDES Permit and the CWA. Neither EPA nor DEQ has commenced or is diligently prosecuting a civil or criminal action to abate the violations alleged in this complaint.

## PARTIES

12.    Plaintiff Northwest Environmental Advocates is a regional non-profit organization founded in 1969; its mission is to work through advocacy, education, and litigation to protect and restore water and air quality, wetlands, and wildlife habitat in the Northwest. NWEA carries out its mission with administrative agencies, community organizing, strategic partnerships, public record requests, information sharing, lobbying, education, and litigation to advance the interests of its members and to ensure better implementation and enforcement of the laws that protect and restore the natural environment. NWEA has members who live, recreate, or work in the Rogue River watershed.

13.    Several of NWEA's members regularly use and enjoy the waters of the Rogue River immediately downstream from Medford's Facility, and have future plans to continue using the river for recreational, aesthetic, spiritual, conservation, educational, employment, and other purposes. These members enjoy fishing, boating, wading, and hiking along the Rogue River downstream from Medford's Facility; they have observed on numerous occasions increased algae and weed growth, a murky and

COMPLAINT – 5

foamy effluent plume, noxious smells, and other effects of Medford's discharges, and as a result their aesthetic enjoyment of the river has been diminished.

14.     Several of NWEA's members are active river conservationists who have devoted considerable time, energy, and money to the restoration of the river and the protection of its aquatic species. These NWEA members are concerned that the Facility's discharges of excess nutrients and other pollution in violation of its NPDES permit threaten aquatic life and, in particular, the continued vibrancy of the River's world-renowned salmon and steelhead runs.

15.     Unless the requested relief is granted, Medford's violations will continue unabated and will continue to injure NWEA's and its members' aesthetic, recreational, and other interests in the Rogue River and the aquatic life it supports.

16.     Defendant City of Medford is a municipality located in Jackson County, in southwestern Oregon. Medford owns and operates the Medford Regional Water Reclamation Facility in the Rogue River watershed and discharges treated effluent at mile 130.5 of the river.

## LEGAL BACKGROUND

17.     Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a)(1). To further this goal, Congress instructed the states, subject to EPA

oversight, to establish water quality standards applicable to the waters within each state's boundaries. 33 U.S.C. § 1313(c).

18.    Water quality standards must include three elements: (1) one or more designated uses of a waterway; (2) numeric and narrative criteria specifying the water quality conditions, such as maximum amounts of toxic pollutants or desired water quality conditions, that are necessary to protect the designated uses; and (3) an antidegradation policy and implementation methods that ensure that "[e]xisting instream water uses and the level of water quality to protect the existing uses [will] be maintained and protected" and that high quality waters will be maintained and protected. 33 U.S.C. §§ 1313(c)(2), 1313(d)(4)(B); 40 C.F.R. §131(b). Water quality standards are binding and enforceable even when they are in the form of narrative or qualitative criteria instead of numerical limitations.

19.    Section 301(a) of the CWA prohibits the discharge of any pollutant by any person unless the discharge is authorized under one of the Act's permitting programs, which include the national pollutant discharge elimination system ("NPDES") created by section 402 of the Act, 33 U.S.C. § 1342. NPDES permits are the primary means of authorizing, and controlling, so-called "point source" discharges of pollutants.

20.    Although EPA is the primary administrator of the CWA, section 402(b) allows EPA to authorize states to administer the NPDES permit program. 33 U.S.C. §

COMPLAINT – 7

1342(b). Oregon is such an authorized state, and DEQ issues NPDES permits within the State of Oregon under Oregon Administrative Rules ("OAR") Chapter 340, Division 45 and various EPA regulations governing NPDES permit issuance.

21.     NPDES permits typically include a suite of numeric or narrative technology-based and water quality-based effluent limitations that restrict the rate and quantity of pollutants the permitted facility may discharge. Where the broadly applicable technology-based limitations are not sufficient to protect water quality, NPDES permits must include "any more stringent limitation . . . necessary to meet water quality standards[.]" 33 U.S.C. § 1311(b)(1)(C). NPDES permits may only be issued where they "insure compliance with" applicable state water quality standards. *Id*. § 1342(b)(1)(A); 40 C.F.R. § 122.4(d).

22.     Section 505 of the CWA authorizes citizens to bring a civil action against any person, including a municipality, who is alleged to be in violation of an effluent standard or limitation under the CWA. 33 U.S.C. § 1365(a). An effluent standard or limitation includes "a permit or condition thereof issued under" CWA Section 402, i.e., an NPDES permit. *Id*. § 1365(f)(6). This citizen enforcement authority extends to both numeric and narrative permit conditions.

## FACTUAL BACKGROUND

### Medford's Facility and the Rogue River

23.     Medford's Facility is located at 1100 Kirtland Road, Central Point, Jackson County, Oregon. The Facility is owned and operated by the City of Medford as a wastewater treatment plant for much of the Rogue River Valley, and it receives and treats municipal wastewater from the cities of Medford, Central Point, Jacksonville, Phoenix, Talent, Eagle Point, and some unincorporated areas in Jackson County. Treated effluent is discharged from the Facility via an outfall located on the south side of the Rogue River at mile 130.5.

24.     The Rogue River flows more than 200 miles from near Crater Lake to the Pacific Ocean, and is one of the original eight rivers protected by the Wild and Scenic Rivers Act of 1968. Designated uses of the Rogue River include wildlife & hunting, fishing, boating, water contact recreation, aesthetic quality, and fish & aquatic life. OAR 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, Table 271A. The Rogue River is home to a diverse variety of aquatic species, and many of its native salmon and steelhead species have been identified as "species of concern" by NOAA Fisheries or as "sensitive species" by the Oregon Department of Fish & Wildlife because of their depressed numbers. Coho salmon have been listed as threatened under the Endangered Species Act, and populations of spring Chinook are in precipitous decline.

COMPLAINT – 9

25.    The Rogue River near and downstream from the Facility is designated to support salmonid spawning from mid-September to mid-June, and is designated as core cold water habitat for fish use year-round. OAR 340-41-027, Figures 271A and 271B. "Core cold water habitat use" is defined to mean waters expected to maintain temperatures within the range generally considered optimal for salmon and steelhead rearing, or that are suitable for bull trout migration, foraging and sub-adult rearing that occurs during the summer. OAR-340-041-0002(13). This use is associated with a temperature criterion of 16ºC.

26.    The section of the Rogue River downstream from the Facility is routinely impacted by nuisance algae, excessive weed growth, depressed dissolved oxygen, objectionable odors and discoloration, and a number of other detrimental changes to water quality and native aquatic communities. Algae and attached aquatic plants (periphyton and macrophytes) frequently cover the rocks in portions of the river immediately downstream from Medford's discharge location, and the Facility's effluent is frequently visible on the surface of the River for hundreds of feet downstream of the Facility as a discolored, turbid, foamy, and smelly plume.

27.    The section of the Rogue River into which the Facility discharges is included on Oregon's list of "impaired waters" under CWA § 303(d), 33 U.S.C. § 1313(d), for inadequate dissolved oxygen from October 15 to May 15. This impairment directly affects beneficial uses such as salmon and steelhead spawning. This section of

the river has also exceeded DEQ's "benchmark criterion" for total phosphates as phosphorus.

28.     In December of 2016, EPA partially disapproved Oregon's most recent list of impaired waters submitted by the State pursuant to CWA § 303(d)(2), in part because DEQ failed to assemble and evaluate all readily available data and information related to potential water quality standard exceedances prior to submitting that list. EPA concurrently proposed to designate the section of the Rogue River between river miles 110.7 and 132.2—the section of river into which Medford discharges—as impaired for Oregon's biocriterion codified at OAR 340-041-0011.

29.     The photograph below was taken in October of 2017, and shows algae-covered rocks in the Rogue River just downstream from Medford's discharge:



The algae depicted in the photograph has a deleterious effect on the bed of the Rogue River, is deleterious to fish or other aquatic life, and reflects detrimental changes in the resident biological communities of the river.

30.     The photograph below was also taken in October 2017, and shows Medford's visibly foamy and discolored effluent plume near and immediately downstream from Medford's discharge location:



The visible foam depicted in the photograph above is objectionable and injurious to the human senses of sight and smell.

31.     The degraded conditions observed in the Rogue River downstream from Medford's Facility are due to primarily to the presence of excess nutrients such as

COMPLAINT – 12

nitrogen and phosphorus, which are common constituents of municipal wastewater. As

EPA has explained,

> Too much nitrogen and phosphorus in the water causes algae to grow faster
> than ecosystems can handle. Significant increases in algae harm water quality,
> food resources and habitats, and decrease the oxygen that fish and other aquatic
> life need to survive. Large growths of algae are called algal blooms and they can
> severely reduce or eliminate oxygen in the water, leading to illnesses in fish and
> the death of large numbers of fish.

EPA, Nutrient Pollution: The Problem, at https://www.epa.gov/nutrientpollution/

problem.

32.     Medford's Facility uses a decades-old "trickling filter/activated sludge"

secondary treatment process with a design treatment capacity of approximately 30

million gallons per day. The Facility often treats considerably higher flows than this,

especially during the winter months, and at times of high influent volume Medford

must bypass some components of its treatment system.

33.     Medford's current treatment system is not designed to treat or remove

nutrients prior to discharge, and while there may be some incidental nutrient removal

it does not significantly reduce the concentrations of nitrogen and phosphorus that

Medford's Facility ultimately discharges to the Rogue River.

34.     Readily available and cost-effective add-on wastewater treatment systems

capable of achieving very low concentrations of nitrogen and phosphorus have been

successfully deployed at existing wastewater treatment facilities throughout the United

COMPLAINT – 13

States, including in Oregon, with acceptable rate impacts on municipal wastewater utility customers. For example, the nearby City of Ashland, Oregon's wastewater treatment facility uses a phosphorus removal system during the summer months that allows it to meet a seasonal phosphorus effluent limit of 1.6 lbs/day. Medford is aware of the availability of these nutrient-removal technologies, yet has chosen not to install them.

### Relevant Conditions of Medford's NPDES Permit

35.    On December 13, 2011, DEQ issued NPDES Permit No. 100985 ("Permit") to the City of Medford, authorizing the Facility to discharge treated wastewater to the Rogue River at mile 130.5. Except for unusually high flow events, the Facility discharges its effluent from a single location identified in the Permit as "Outfall 001."

36.    The Facility's Permit includes, among other conditions, numeric and narrative effluent limitations for certain pollutants, monitoring and reporting requirements, a duty to report instances of noncompliance with effluent limitations, a requirement to properly operate and maintain all pollution treatment and control systems, and a requirement to satisfy its schedule of compliance.

37.    Schedule A, Condition 1.e. of Medford's Permit states as follows:

No wastes may be discharged or activities conducted that cause or contribute to a violation of water quality standards in OAR 340-041

COMPLAINT – 14

applicable to the Rogue Basin except as provided for in OAR 340-045-0080 and the following regulatory mixing zone:

> The allowable mixing zone is that portion of the Rogue River contained within a band extending out 100 feet from the south bank of the river and extending from a point 10 feet upstream of the outfall to a point 300 feet downstream from the outfall. The Zone of Immediate Dilution (ZID) is defined as that portion of the allowable mixing zone that is within 2 feet upstream to 30 feet downstream of the point of discharge.

This Permit condition, in effect, prohibits Medford from discharging pollutants in amounts that cause or contribute to a violation of any Oregon water quality standard applicable to the Rogue River outside of the mixing zone.

38.    One of the water quality standards in OAR 340-041, and therefore applicable to Medford's Facility under Schedule A, Condition 1.e. of its Permit, is Oregon's state-wide narrative "biocriterion," which provides as follows:

> Waters of the State must be of sufficient quality to support aquatic species without detrimental changes in the resident biological communities.

OAR 340-041-0011.

39.    As used in Oregon's biocriterion, the phrase "without detrimental changes in the resident biological community" means "no loss of ecological integrity when compared to natural conditions at an appropriate reference site or region," and "ecological integrity" means "the summation of chemical, physical, and biological integrity capable of supporting and maintaining a balanced, integrated, adaptive community of organisms having a species composition, diversity, and functional

COMPLAINT – 15

organization comparable to that of the natural habitat of the region." OAR 340-041-0002(19), (75).

40.     As explained by EPA, a biocriterion is a narrative provision used to "describe a desired condition for the aquatic life in waters [States] have designated for aquatic life use." EPA Office of Water, Biological Assessments and Criteria: Crucial Components of Water Quality Programs (Summer 2002), *available at* https://nepis.epa.gov/Exe/ZyPDF.cgi/20003HMF.PDF?Dockey=20003HMF.pdf.

41.     Another water quality standard in in OAR 340-041, and therefore applicable to Medford's Facility under Schedule A, Condition 1.e. of its Permit, consists of the following narrative, state-wide criteria:

> (9) The development of fungi or other growths having a deleterious effect on stream bottoms, fish or other aquatic life, or that are injurious to health, recreation, or industry may not be allowed;
>
> (10) The creation of tastes or odors or toxic or other conditions that are deleterious to fish or other aquatic life or affect the potability of drinking water or the palatability of fish or shellfish may not be allowed;
>
> (11) The formation of appreciable bottom or sludge deposits or the formation of any organic or inorganic deposits deleterious to fish or other aquatic life or injurious to public health, recreation, or industry may not be allowed;
>
> (12) Objectionable discoloration, scum, oily sheens, or floating solids, or coating of aquatic life with oil films may not be allowed;
>
> (13) Aesthetic conditions offensive to the human senses of sight, taste, smell, or touch may not be allowed;

COMPLAINT – 16

OAR 340-041-0007(9)-(13).

42.     Schedule F, Condition A3 of Medford's Permit requires Medford to "take all reasonable steps to minimize or prevent any discharge . . . in violation of this permit that has a reasonable likelihood of adversely affecting human health or the environment."

43.     The Facility's Permit expired on November 30, 2016, but it has been administratively continued and remains in full force and effect due to Medford's timely submission of a renewal application, pursuant to 40 C.F.R. § 122.6(d)(1).

**Medford's Past and Ongoing Violations of its NPDES Permit**

44.     Medford has long been aware of the detrimental impacts its pollution discharges have caused and continue to cause to the Rogue River. A series of studies, completed in 2013 and 2014, found that the section of the Rogue River immediately downstream from the Facility's Outfall 001 and outside of the permitted mixing zone is suffering from significant growths of algae and aquatic plants and loss of macroinvertebrate diversity as compared to sites upstream from the Facility. A recent follow-up investigation, conducted during September 2017 at NWEA's direction, show that these degraded conditions continue to exist downstream from Medford's Facility.

45.     All three of the studies conducted in 2013-2014 were intended to assess the biological integrity of the Rogue River both upstream and downstream of Medford's Facility, and to describe and ascertain the cause or causes of the water

quality impairments that had long been observed in the river downstream from Medford's discharge. Through the comparative use of upstream and downstream sampling locations, the studies were able to identify detrimental changes to the aquatic community attributable, at least in large part, to discharges from Medford's Facility.

46.    First, in January 2013, aquatic biologist Rick Hafele (a retired DEQ employee) prepared a report entitled *Medford Regional Water Reclamation Facility Outfall Assessment Study*. ("Hafele Report"). Among other impacts, Mr. Hafele identified significant detrimental changes in the Rogue River between sampling locations upstream and downstream of the Facility's Outfall 001, including changes in in density of algal and aquatic plant growth and changes in the abundance and diversity of certain water-dependent macroinvertebrates, indicating excessive nutrient contribution from the Facility.

47.    Second, in September 2013, DEQ released a Technical Report entitled *Rogue River Algae Reconnaissance: A Response to the Algae Concerns Related to the Medford WWTP*. ("DEQ Report"). The DEQ Report was consistent with the Hafele Report with respect to biological conditions upstream and downstream of the Facility's outfall. In the DEQ Report, the agency described "obvious changes in macroinvertebrate and algal assemblages at the nearest site downstream from the [Facility], compared to not only the nearest upstream and next downstream sites, but also to any other site in the Upper or Lower Reaches observed during this study." DEQ concluded that

COMPLAINT – 18

Given the similarities between the [Hafele and DEQ Reports] and the quantitative nature of the results presented by Hafele, there is clear evidence of detrimental changes in the resident biological communities 0.3 miles below the [Facility]. These changes were represented by significant reductions in density, diversity, and sensitive macroinvertebrates. The signal of these changes appear to persist downstream to at least 1.0 miles below the [Facility's] outfall[.]

48.    In April 2014, the City of Medford commissioned a study by a consultant, Brown & Caldwell, entitled *Medford Regional Water Reclamation Facility: Mixing Zone and Biological Assessment Study*. ("Brown & Caldwell Report"). This study assessed the mixing zone, but also observed an increase in algal density and other environmental impairment downstream of the outfall. The Brown & Caldwell Report also found that total nitrogen and total phosphorus concentrations were consistently much higher immediately below the Facility's mixing zone than they were at the upstream monitoring location, concluding that "it appears likely that the effluent plume is discharging nutrient levels that could stimulate aquatic growth some distance from the [regulatory mixing zone] to the complete mix condition." Further, the Brown & Caldwell Report concluded that "the macroinvertebrate data indicate environmental impairment downstream of the outfall[.]"

49.    Together, the three studies indicate the Facility's discharges have long violated and continue to violate Oregon's narrative biocriterion by reducing the overall ecological integrity and the water quality necessary to support diverse and native aquatic species in the section of the Rogue River downstream from the Facility.

COMPLAINT – 19

50.    In September 2017, an investigation of the condition of the Rogue River downstream from Medford's Outfall 001 conducted at NWEA's request yielded observations that the water downstream from the Facility's outfall continues to violate the narrative biocriterion consistent with conclusions reached in the studies described above. In September 2017, an increased abundance of nuisance algae was clearly greater below the Facility, and a visible, foamy, and discolored effluent plume was clearly present on the surface of the River below the Outfall.

51.    Furthermore, Mr. Hafele, DEQ employees, employees of Brown & Caldwell, NWEA members, and numerous other frequent users of the Rogue River near and downstream from Medford's Outfall 001 have observed and documented repeated violations of Oregon's narrative criteria at OAR 340-041-0007(9)-(13) between 2012 and 2017, on at least the dates summarized in the table below:

| Dates of Violations | Observed and Documented In-Stream Effects (Violations of OAR 340-041-0007) |
|---|---|
| October 10 & 11, 2012 | • Formation of "growths having a deleterious effect on stream bottoms, fish or other aquatic life"<br>• In-stream "conditions that are deleterious to fish or other aquatic life"<br>• "The formation of appreciable bottom . . . deposits or the formation of any organic . . . deposits deleterious to fish or other aquatic life[.]"<br>• Presence of "objectionable discoloration" and "floating solids"<br>• Presence of "aesthetic conditions offensive to the human senses of sight, taste, smell, or touch" |
| September 25, 2013 | • Formation of "growths having a deleterious effect on stream bottoms, fish or other aquatic life"<br>• In-stream "conditions that are deleterious to fish or other aquatic life"<br>• "The formation of appreciable bottom . . . deposits or the formation of any organic . . . deposits deleterious to fish or other aquatic life[.]" |
| October 16 & 17, 2013 | • Formation of "growths having a deleterious effect on stream bottoms, fish or other aquatic life"<br>• "The formation of appreciable bottom . . . deposits or the formation of any |

| | organic . . . deposits deleterious to fish or other aquatic life[.]" |
|---|---|
| October 7, 2016 | • Presence of "objectionable discoloration" and "floating solids"<br>• Presence of "aesthetic conditions offensive to the human senses of sight, taste, smell, or touch" |
| June 18, 2017 | • Presence of "objectionable discoloration" and "floating solids"<br>• Presence of "aesthetic conditions offensive to the human senses of sight, taste, smell, or touch" |
| September 20, 2017 | • Formation of "growths having a deleterious effect on stream bottoms, fish or other aquatic life"<br>• In-stream "conditions that are deleterious to fish or other aquatic life"<br>• "The formation of appreciable bottom . . . deposits or the formation of any organic . . . deposits deleterious to fish or other aquatic life[.]"<br>• Presence of "objectionable discoloration" and "floating solids"<br>• Presence of "aesthetic conditions offensive to the human senses of sight, taste, smell, or touch" |

52.    Medford has not materially changed its wastewater treatment system or installed additional pollution control equipment since receiving the studies described above. Notably, it has not installed modern and readily available equipment capable of removing excess nitrogen and phosphorus from its effluent prior to discharge. As a result, Medford's discharges of nitrogen, phosphorus, and other pollutants that are causing or contributing to the in-stream violations of Oregon's biocriterion have not been reduced, and are ongoing.

53.    Medford has not undertaken any effort to reduce or eliminate the aesthetically displeasing visible, discolored, smelly, and foamy effluent plume that it discharges from Outfall 001 on a regular basis. On each day that Medford discharges to the Rogue River its effluent plume results in "objectionable discoloration," "floating solids," and the presence of "aesthetic conditions offensive to the human senses of

sight, taste, smell, or touch," in violation of Oregon's narrative criteria at OAR 340-041-0007(9)-(13).

54.    Reasonable steps are available to Medford that would minimize or prevent any discharge in violation of Medford's Permit that has a likelihood of adversely affecting human health or the environment, yet Medford has repeatedly failed to take such steps since becoming aware of its biocriterion and narrative criteria violations.

**FIRST CLAIM FOR RELIEF**
**(Violations NPDES Permit Schedule A, Condition 1.e. and**
**Oregon's Biocriterion, OAR 340-041-0011)**

55.    NWEA incorporates and re-alleges each of the preceding paragraphs.

56.    Schedule A, Condition 1.e. of Medford's Permit states that "no wastes may be discharged or activities conducted that cause or contribute to a violation of water quality standards in OAR 340-041 applicable to the Rogue Basin except as provided for in OAR 340-045-0080 and the . . . regulatory mixing zone."

57.    OAR 340-041 states that "waters of the State must be of sufficient quality to support aquatic species without detrimental changes in the resident biological communities." OAR 340-0411-0011.

58.    Medford's Facility violated Permit Schedule A, Condition 1.e. on each date upon which the Facility had a discharge to the Rogue River since at least October 10, 2012, which was the first sampling date identified in the Hafele Report, by

discharging wastes that contribute to detrimental changes in the resident biological communities downstream of Medford's Outfall, thereby violating Oregon's biocriterion at OAR 340-0411-0011, Medford's Permit, and the CWA.

59.    Medford's violations of Oregon's biocriterion have occurred continuously since at least October 10, 2012, but were observed and documented by the persons conducting the relevant studies on at least the following dates: October 10 & 11, 2012 (Hafele); September 25, 2013 (DEQ); October 14-17, 2013 (Brown & Caldwell); September 20, 2017 (NWEA's expert).

60.    Medford had not taken action to reduce or eliminate the biocriterion violations described above; those violations are ongoing and, unless abated by an order of the Court, will continue indefinitely.

61.    Each occasion upon which Medford's Facility violates Schedule A, Condition 1.e. of its Permit is a violation of an "effluent standard or limitation" under the CWA's citizen suit provision. 33 U.S.C. § 1365(a)(1), (f)(6).

62.    Medford's Permit violations alleged above warrant the imposition of declaratory and injunctive relief and the assessment of civil penalties in the amount of up to $53,484 per day of violation. 33 U.S.C. §§ 1365(a), 1319(d); 40 C.F.R. § 19.4.

<u>**SECOND CLAIM FOR RELIEF:**</u>
**(Violations NPDES Permit Schedule A, Condition 1.e. and
Oregon's Statewide Narrative Criteria, OAR 340-041-0007)**

63.    NWEA incorporates and re-alleges each of the preceding paragraphs.

COMPLAINT – 23

64.     Schedule A, Condition 1.e. of Medford's Permit states that "no wastes may be discharged or activities conducted that cause or contribute to a violation of water quality standards in OAR 340-041 applicable to the Rogue Basin except as provided for in OAR 340-045-0080 and the . . . regulatory mixing zone."

65.     Oregon's narrative water quality criteria at OAR 340-041-0007(9)-(13) provide as follows:

> (9) the development of fungi or other growths having a deleterious effect on stream bottoms, fish or other aquatic life, or that are injurious to health, recreation, or industry may not be allowed;
> (10) the creation of tastes or odors or toxic or other conditions that are deleterious to fish or other aquatic life or affect the potability of drinking water or the palatability of fish or shellfish may not be allowed;
> (11) the formation of appreciable bottom or sludge deposits or the formation of any organic or inorganic deposits deleterious to fish or other aquatic life or injurious to public health, recreation, or industry may not be allowed;
> (12) objectionable discoloration, scum, oily sheens, or floating solids, or coating of aquatic life with oil films may not be allowed;
> (13) aesthetic conditions offensive to the human senses of sight, taste, smell, or touch may not be allowed.

66.     Medford's Facility violated Permit Schedule A, Condition 1.e. on each date upon which the Facility had a discharge to the Rogue River since at least October 10, 2012, which was the first sampling date identified in the Hafele Report, by discharging wastes that contribute to "the creation of states or odors . . . deleterious to fish or other aquatic life"; "objectionable discoloration, scum, oily sheens, or floating solids may not be allowed"; and "aesthetic conditions offensive to the human senses of

sight, taste, smell, or touch may not be allowed," thereby violating Oregon's narrative

criteria at OAR 340-041-0007(10), (12), (13), Medford's Permit, and the CWA.

67.     Observations documented in the Hafele, DEQ, and Brown & Caldwell

Reports; observations documented by NWEA members and other users of the Rogue

River; and observations documented through the recent NWEA investigation indicate

the Facility's discharges have caused or contributed to violations of the statewide

narrative criteria downstream from the Facility and outside the mixing zone repeatedly,

but on at least the following dates: October 10 & 11, 2012; September 25, 2013;

October 16 & 17, 2013; October 7, 2016; June 18, 2017; and September 20, 2017.

68.     Medford had not taken action to reduce or eliminate the narrative criteria

violations described above; those violations are ongoing and, unless abated by an order

of the Court, will continue indefinitely.

69.     Each occasion upon which Medford's Facility violates Schedule A,

Condition 1.e. of its Permit is a violation of an "effluent standard or limitation" under

the CWA's citizen suit provision. 33 U.S.C. § 1365(a)(1), (f)(6).

70.     Medford's Permit violations alleged above warrant the imposition of

declaratory and injunctive relief and the assessment of civil penalties in the amount of

up to $53,484 per day of violation. 33 U.S.C. §§ 1365(a), 1319(d); 40 C.F.R. § 19.4.

<u>THIRD CLAIM FOR RELIEF:</u>
**(Violations of NPDES Permit Schedule F, Condition A3: Duty to Mitigate)**

71.    NWEA incorporates and re-alleges each of the preceding paragraphs.

72.    Schedule F, Condition A3 of Medford's Permit requires it to take "all reasonable steps to minimize or prevent any discharge . . . in violation of this permit that has a reasonable likelihood of adversely affecting human health or the environment." This provision imposes on Medford an affirmative duty to mitigate the violations alleged above in NWEA's First and Second Claims for Relief.

73.    Medford has been aware of the adverse environmental effects downstream from its Facility and resulting from its biocriterion and narrative criteria violations since at least February 2013, but has not taken all reasonable steps to minimize or prevent those violations.

74.    Reasonable steps are available to Medford that would reduce or eliminate its biocriterion and narrative criteria violations. These steps include, but are not limited to: (1) optimization of Medford's existing wastewater treatment system to reduce the amounts and concentrations of the nutrients nitrogen and phosphorus contained in Medford's effluent; (2) installation of new wastewater treatment equipment specifically designed to remove nitrogen and phosphorus prior to discharge; and (3) modification, relocation, or redesign of Medford's outfall and related equipment to reduce or eliminate Medford's visible, foamy effluent plume.

COMPLAINT – 26

75.    Medford's violations of Schedule F, Condition A3 of its Permit are ongoing and, unless abated by an order of the Court, will continue indefinitely.

76.    Each occasion upon which Medford's Facility violates Schedule F, Condition A3 of its Permit is a violation of an "effluent standard or limitation" under the CWA's citizen suit provision. 33 U.S.C. § 1365(a)(1), (f)(6).

77.    Medford's Permit violations alleged above warrant the imposition of declaratory and injunctive relief and the assessment of civil penalties in the amount of up to $53,484 per day of violation. 33 U.S.C. §§ 1365(a), 1319(d); 40 C.F.R. § 19.4.


## REQUEST FOR RELIEF

WHEREFORE, Plaintiff NWEA respectfully requests that this Court grant the following relief:

1. Assess civil penalties against Medford in the amount of $52,414 per day per violation;

2. Permanently enjoin Medford from discharging pollutants into Rogue River in violation of its Permit;

3. Issue injunctive relief requiring Medford to remediate the environmental damage and ongoing impacts, and to take such action as may be necessary to discontinue its unlawful discharges to Rogue River;

COMPLAINT – 27

4.  Award Plaintiff its reasonable costs of litigation pursuant to 33 U.S.C. §

    1365(d); and

5.  Grant such other relief as the Court deems just and proper.

Respectfully submitted this 16th day of May, 2018.

s/ James N. Saul

JAMES SAUL (OSB #152809)
LIA COMERFORD (OSB #141513)
Earthrise Law Center
Lewis & Clark Law Center
10015 SW Terwilliger Blvd.
Portland, OR 97219
Saul tel: (503) 768-6929
Comerford tel: (503) 768-6823
Fax: (503) 768-6642
jsaul@lclark.edu
comerford@lclark.edu

COMPLAINT – 28